UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                          Case No. 19-CR-127

DONALD STENSON,

        Defendant.

**GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION FOR RELEASE PURSUANT TO 18 U.S.C. § 3142(i)**

The United States of America, by and through its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Megan Paulson and Abbey Marzick, Assistant United States Attorneys for said district, hereby respectfully responds to Donald STENSON's motion for pretrial release, pursuant to 18 U.S.C. § 3142(i), in the above-entitled action. (ECF 47)

    **I.    BACKGROUND**

On July 9, 2019, a grand jury in the Eastern District of Wisconsin returned an eight count indictment against Donald STENSON (the defendant). In this original indictment, STENSON is charged in Counts One through Four with, while traveling in foreign commerce and permanently and temporarily residing in a foreign country, engaged in and attempted to engage in illicit sexual conduct with a minor who was then under 18 years of age, in violation of Title 18 U.S.C. §§ 2423(c) and (e). The four counts represent four child victims (Minor 1 – 4), who were between the ages of 11 and 17 at the time of the sexual conduct. Further in the original indictment, STENSON is charged in Counts Five through Eight with knowingly, in and affecting interstate and foreign commerce, enticing, patronizing, and soliciting by any means a minor, knowingly and in reckless

1

disregard of the fact that the minor had not attained the age of 18 years, and would be caused to engage in a commercial sex act, in violation of Title 18 U.S.C. §§ 1591(a)(1), 1591(b)(1), and 1596(a)(1). Counts Five through Eight represent the same four child victims as referenced in Counts One through Four. All of the charged criminal conduct is alleged to have occurred between on or about November 1, 2016 and June 1, 2019, in the Republic of the Philippines.

On December 12, 2019, a grand jury in the Eastern District of Wisconsin returned a 22 count superseding indictment against STENSON. Counts One through Four remained the same. Count Five charged the defendant with the same crime as Counts One through Four, adding a fifth child victim (Minor 5). Counts 6 and 7 charge the defendant with aiding and abetting co-defendant John BURGDORFF to travel in foreign commerce and engage in illicit sexual conduct with Minor 3 and Minor 5, in violation of Title 18 U.S.C. §§ 2423(c) and (e) and 2. Count 8 charges the defendant, with, knowingly in and affecting interstate and foreign commerce, recruiting, enticing and soliciting by any means, Minor 1, who was then under age 14, in violation of Title 18 U.S.C. §§ 1591(a)(1), (b)(1), and (c) and 1596(a)(1). Counts 9 through 12 charge the defendant with knowingly, in and affecting interstate and foreign commerce, recruiting, enticing, and soliciting by any means, Minors 2 – 5, who were all under the age of 18, to engage in a commercial sex act, in violation of Title 18 U.S.C. §§ 1591(a)(1), (b)(2), and (c), and 1596(a)(1). Counts 13 and 14 charge the defendant with, knowingly in, and affecting interstate and foreign commerce, recruiting, enticing, and soliciting by any means, Minors 3 and 5, who were both under the age of 18, to engage in a commercial sex act with co-defendant John BURGDORFF. Counts 15 through 22 charge co-defendant BURGDORFF with similar offenses.

On July 17, 2019, Judge David Jones signed an Order of Detention Pending Trial (ECF 4). The order reflects a rebuttable presumption of detention under 18 U.S.C. §§ 1342 (e)(3), for certain offenses involving minor victims. On July 24, 2019, a detention hearing was held before Judge

Jones. The government argued for continued detention, citing numerous factors, including but not limited to: (1) the defendant's incentive to flee the jurisdiction given the substantial penalties associated with the charges, including a 15 year mandatory minimum; (2) the danger to the community posed by the defendant, given the allegations of sexual abuse and trafficking of minor children ranging in ages 11 to 17; (3) the defendant's significant ties to the community outside of the United States, including a residence in Thailand and ownership of property in Thailand; (4) the high sophistication level of the defendant's travel, including a history of travel to 50 foreign countries; and (5) evidence of the defendant's prior attempts to destroy evidence (i.e. he instructed one minor victim to delete electronic "chats" of himself and the minor victim). Judge Jones denied the defendant's motion and continued the detention order pending trial. (ECF 8). In support of its order, the Court cited a number of the factors argued by the government.

A second detention hearing was held on October 18, 2019, this time before Judge William Duffin. The defendant's detention was again continued (ECF 21). The Court noted that there was not enough evidence introduced by the defendant to revisit Judge Jones' detention decision. STENSON now moves, for the third time, temporary release. In support of his motion, the defendant bases his reasoning on the current COVID-19 pandemic and the health risk posed to the defendant. The government opposes this motion for the following reasons.

## II. ANALYSIS

### Standard of Review

After a defendant has been detained, a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Such relief is reserved for "extraordinary circumstances." *See United States v. Rebolla-Andino*,

3

312 Fed. App'x 346, 348 (1st Cir. 2009). The defendant bears the burden to show a "compelling reason" for temporary release. *See United States v. Dupree*, 833 F.Supp.2d 241, 246 (E.D.N.Y. 2011); *see also United States v. Jeffries*, 2011 WL 182867 at *4 (E.D.Tenn. Jan. 20, 2011)*; United States v. Birbragher*, 2008 WL 2246913 at *1-2 (N.D.Iowa May 28, 2008). "The standard imposed by the statute is one of necessity, not convenience." *United States v. Reese*, 2012 WL 13081673 at *1 (D.N.M. 2012). STENSON has already challenged the original detention order. Thus, he is essentially asking for another review of both Judge Jones' and Judge Duffin's orders, due solely to the current public health crisis. STENSON again fails to show that he is entitled to relief.

## Discussion

*STENSON'S assertions*

STENSON correctly notes that we are in the midst of the COVID-19 pandemic. He also accurately notes that he is 63 years old. STENSON further asserts that he has "bladder problems and prostate issues,"[1] that he takes medicine for these issues, and that he gets up multiple times per night to urinate (ECF 47 at 7). There is no evidence that a single inmate currently housed at the Waukesha County Jail has COVID-19. Even if someone at the Waukesha County Jail was diagnosed with the illness, there is no evidence that the facility is incapable of handling those who are sick (including STENSON) or controlling the spread of the virus. STENSON then makes generalized claims about conditions at jail facilities, such as incarcerated people tend to have poorer health than the general population and that confinement conditions create the "ideal environment for the transmission of contagious disease" (ECF 47 at 4). However, STENSON

---

[1] Of note, no medical documentation has been provided by defense to support his health claims. The Centers for Disease Control state that those *65 and older* are at greater risk of severe illness from COVID-19. The defendant is 63 years old, and his prostate and urinary issues are not recognized as underlying conditions that increase his risk from the illness. Centers for Disease Control, "People who are at higher risk for severe illness," https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (visited 3/31/20).

4

offers no proof that such conditions actually exist at the Waukesha County Jail. Further, STENSON offers as a comparison the recent experience of prisons in two authoritarian states – China and Iran – as though these countries observe the rights of inmates in the same way as our system, including maintaining prisons having conditions comparable to facilities like the Waukesha County Jail (ECF 47 at 4-5). This is an over-generalized and highly speculative argument. STENSON further offers the baseless conclusion that the "Waukesha County Jail is not equipped to protect the health and safety of defendants in their custody during a severe outbreak like this" (ECF 47 at 6).

*Conditions at Waukesha County Jail*

Waukesha County Jail has implemented procedures for addressing COVID-19, despite having no suspected or confirmed cases of the disease at this time. For instance, according to Jim Matthews, Health Services Administrator of the Waukesha County Jail, facility personnel screen all incoming inmates (both new inmates and existing inmates returning to the facility) to determine if they may have COVID-19. If facility personnel suspect an incoming inmate has COVID-19, they immediately notify medical staff. At that point, a local emergency room must medically clear the inmate before entry into the jail. The facility has also placed additional postings in the inmate housing areas regarding COVID-19, including illustrated instructions on hand washing in both English and Spanish. The facility has increased cleaning protocols and guidance regarding the disinfecting of hard surfaces and communal areas as well. If the facility were to confirm a case of COVID-19, it has the capacity to address it – inmates have full access to trained medical personnel 24 hours a day, seven days a week. Alternative housing is also available for those who may become ill. Furthermore, the facility has cancelled public visitation to limit the possibility of the disease entering the facility (inmates, however, are encouraged to maintain contact with family and friends via telephone). Waukesha County Jail, therefore, has pursued reasonable preventive measures,

5

and the mere prospect of COVID-19 at the facility is not a "compelling reason" to release an inmate. According to case law, a defendant like STENSON, who is both a danger to the community and also a flight risk, must demonstrate much more to have a "compelling reason" justifying his release.

*Legal Analysis*

In two published decisions, federal courts identified occasions when an otherwise "dangerous" defendant's medical condition constituted a "compelling reason" meriting release from pretrial detention. The instant case is factually distinguishable from these earlier decisions. In *United States v. Scarpa,* 815 F. Supp. 88 (E.D.N.Y. 1993), the court released a terminally ill defendant who had been detained prior to trial, under the condition that he be confined at a hospital under 24-hour guard by the U.S. Marshal's Service. The defendant was in the final stages of AIDS, partially blind, suffering from infections, experiencing AIDS-related dementia, and expected to live no more than one to two months. 815 F. Supp. at 90. Vital to the court's determination was its finding that the staff of the Metropolitan Correctional Center (MCC), where the defendant was in pretrial detention, could not, "despite their best intentions and efforts, humanely care for defendant's needs." *Id.* at 92.

In *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002), the court placed a gravely wounded defendant on 24-hour house arrest at either a medical facility or his grandmother's residence. The defendant sustained "serious" and "grotesque" gunshot wounds, suffered a heart attack, underwent an emergency tracheotomy, was partially paralyzed, could not use his left hand, and had open and infected wounds. 185 F. Supp. 2d at 144. Finding "the Bureau of Prisons [could not] provide the necessary medical care defendant require[d]," the court authorized pretrial release under the restrictive conditions specified in its order. *Id*. at 146. The court emphasized its decision was "limited to the extraordinary facts of this case, and, in the future,

should not be considered *carte blanche* by any injured or ailing defendant as a basis for arguing his or her pretrial release." *Id*.

Essential to both courts' determinations was their finding that the jails could not offer adequate care for gravely infirm or terminal pretrial detainees. Unlike Scarpa and Cordero Caraballo, STENSON is not presently suffering from a health condition (certainly not a grave or terminal condition) that the Waukesha County Jail is incapable of treating. Like Scarpa and Cordero Caraballo, STENSON is also a danger to the community. *See Scarpa*, 815 F. Supp. at 92 (the magistrate judge's "findings with respect to [Scarpa's] dangerousness were unquestionably correct"); *Cordero Caraballo*, 185 F. Supp. 2d at 145 ("the Court would most likely order the defendant detained on dangerousness grounds"). Unlike *Scarpa* and *Cordero Caraballo*, however, STENSON does not suffer from an incapacitating condition, which undoubtedly also influenced the *Scarpa* and *Cordero Caraballo* courts' decisions. As the *Cordero Caraballo* court noted, a finding that a defendant was a danger to the community "is premised on the assumption that the defendant be mobile enough to roam in the community. However, [due to Cordero Caraballo's medical condition], such is not the case here." *Cordero Caraballo*, 185 F. Supp. 2d at 145. Thus, the incapacitating effects of Scarpa and Cordero Caraballo's conditions mitigated their dangerousness enough to permit their pretrial release. Yet, despite Scarpa and Cordero Caraballo's extreme incapacity, the courts remained concerned about their dangerousness and nonetheless imposed severe restrictions on their freedom. In Scarpa's case, the court directed the U.S. Marshal's Service to post a guard outside his hospital room for 24 hours per day. *Scarpa*, 815 F. Supp. at 93. In Cordero Caraballo's case, the court directed the defendant remain under 24-hour house arrest. *Cordero Caraballo*, 185 F. Supp. 2d at 146. STENSON does not possess Scarpa or Cordero Caraballo's extreme incapacity and is certainly "mobile enough to roam the community"

if released. *See id.* at 145. STENSON remains an uncompromised danger to the community, which cannot be adequately mitigated by lesser forms of restraint, like electronic monitoring.

Just in the last week, federal district courts across the country have decided similar pretrial release motions based on the current pandemic. Many decisions denying such relief highlight the lack of compelling reasons as well as the speculative nature of the defense argument. [2]

If released, STENSON proposes residing with his older sister, Ellen Jessen. When a court temporarily releases a defendant from pretrial detention, Section 3142(i) requires the defendant be placed in the custody of an "appropriate person" (if not a United States marshal). In *Cordero Caraballo*, the court released the defendant into the custody of his relatives, in part, because some of them were nurses, who "[could] indeed take care of the defendant's medical needs." 185 F. Supp. 2d at 146. Cordero Caraballo's relatives were thus the "appropriate" people to take custody of him given his medical condition. Given the COVID-19 epidemic, a structured and disciplined environment that strictly observes protocols for mitigating the spread of the virus and provides

---

[2] *See* **United States v. Clark**, No. 19-40068-01-HLT, 2020 WL 1446895 (D. Kansas March 25, 2020) (responding to defendant detailed pending trial: "On balance, Mr. Clark has not established compelling reasons sufficient to persuade the court that temporary release is necessary. He has established only that his status as a diabetic puts him at an increased risk for experiencing severe illness if he were to contract COVID-19. His arguments regarding the risk of an outbreak at his facility is speculative. Furthermore, he has not established that his proposed release plan would necessarily alleviate his overall COVID-19 risks."); **United States v. Fitzgerald, No. 2:17-cr-00295-JCM-NJK, 2020 WL 1433932** (D. Nevada. March 24, 2020) (responding to habeas application: "Defendant argued for the first time in reply that he faces an increased risk of contracting COVID-19 if he remains in custody.... Defendant's argument, however, applies equally to anyone in custody or, for that matter, at the halfway house or anywhere else in this community or any other. Defendant's argument applies equally to every detainee in detention; however, the Court cannot release every detainee at risk of contracting COVID-19 because the Court would then be obligated to release every detainee."); **United States v. Williams, No. PWG-13-544, 2020 WL 1434130** (D. Nevada. March 24, 2020) (responding to emergency motion to reconsider setting bond: "The Court has reflected on all of the considerations and factors in play at the detention hearing held on February 11. Even with the pandemic that has befallen us, it does not change the calculus of detention here.... Defendant has still failed to demonstrate by clear and convincing evidence that release is appropriate. The existence of the present pandemic, without more, is not tantamount to a "get out of jail free" card. Not even for the older person being detained. While there has been a change in conditions as a result of the pandemic, there has not been enough change to justify the release of Mr. Williams.")

ready access to medical care is better suited, if not best suited, for someone who, like STENSON, has a manageable, underlying medical condition. The Waukesha County Jail provides such an environment. STENSON cannot legitimately claim that his sister can offer as good or better conditions than the Waukesha County Jail to address STENSON's current or potential needs. STENSON, therefore, has not demonstrated that his sister is an "appropriate person" within the meaning of Section 3142(i).

### III. CONCLUSION

STENSON's concerns are understandable, but he has not provided a "compelling reason" for his temporary release from pretrial detention under Section 3142(i). Specifically, he has not shown that he has a grave medical condition that is unmanaged by the medical staff at the Waukesha County Jail. Furthermore, even assuming *arguendo* that STENSON demonstrated a "compelling reason" for his temporary release, he has not identified an "appropriate person" to take custody of him given his stated concerns. Accordingly, STENSON's motion should be DENIED.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2020.

          Respectfully submitted,

          MATTHEW D. KRUEGER
          United States Attorney

By:    s/Abbey Marzick

          ABBEY MARZICK
          MEGAN PAULSON
          Assistant United States Attorneys
          Abbey Marzick Bar Number: 1087215
          Attorneys for Plaintiff
          Office of the United States Attorney
          Eastern District of Wisconsin
          517 East Wisconsin Avenue, Room 530
          Milwaukee, Wisconsin   53202
          Telephone: (414) 297-1630
          E-Mail: abbey.marzick@usdoj.gov