UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Case No. 19-CR-127 |
| | ) |
| v. | ) Milwaukee, WI |
| | ) |
| DONALD A. STENSON, | ) August 8, 2022 |
| | ) 9:30 a.m. |
| Defendant. | ) |

_____

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:

United States Dept. of Justice
Computer Crime and Intellectual
Property Section
Child Exploitation and
Obscenity Section
By:  MR. WILLIAM G. CLAYMAN
1301 New York Ave NW, 11th Fl.
Washington, DC  20005
Ph:  202-514-0040
william.clayman@usdoj.gov

United States Dept. of Justice
(ED-WI)
By:  MS. MEGAN J. PAULSON
     MS. ABBEY MARZICK
Office of the US Attorney
517 E. Wisconsin Ave, Rm. 530
Milwaukee, WI  53202
Ph:  414-297-1775
megan.paulson@usdoj.gov
abbey.marzick@usdoj.gov

APPEARANCES (Cont'd.):

For the Defendant
DONALD A. STENSON:                    Rose & de Jong, S.C.
                                      By:  MR. VICTOR E. PLANTINGA
                                      1134 N. 9th St., Ste. 220
                                      Milwaukee, WI  53223
                                      Ph:  414-274-1400
                                      vep@rosedejong.com


U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

1        **I N D E X**

2        **WITNESSES**

3    ALL WITNESSES:                                      PAGE:

4    For the Defendant:

5      DONALD ARTHUR STENSON:
         Direct Examination by Mr. Plantinga          4:25
6        Cross-Examination by Mr. Clayman             14:10

7                          **EXHIBITS**

8    None

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          TRANSCRIPT OF PROCEEDINGS

2          THE COURT:  This is US versus Stenson, 19-CR-127.

3   Appearances, please.

4          MR. CLAYMAN:  Good morning, your Honor.  Bill Clayman,

5   Abbey Marzick, and Megan Paulson for the United States.

6          MS. MARZICK:  Good morning.

7          MS. PAULSON:  Good morning.

8          MR. PLANTINGA:  The defendant, Donald Stenson, appears

9   in person and by Attorney Victor Plantinga.  Good morning, your

10  Honor.

11         THE COURT:  Okay.  Mr. Plantinga, this is a hearing on

12  your motion.  You want to proceed?

13         MR. PLANTINGA:  Yes.

14         THE COURT:  Okay.

15         MR. PLANTINGA:  I would like to call Mr. Stenson to

16  the stand.

17         THE COURT:  Okay.

18         Please raise your right hand.

19         (Defendant sworn.)

20         THE COURT:  Go ahead.

21                 DONALD ARTHUR STENSON,

22  called by the Defendant as a witness herein, having been first

23  duly sworn, was examined and testified as follows:

24                 DIRECT EXAMINATION

25                 BY MR. PLANTINGA:

1   Q.   Mr. Stenson -- or, sorry, can you state your name for the

2   record.

3   A.   My name is Donald Arthur Stenson.

4   Q.   Okay.  And please have the microphone close to you and

5   please speak into it loudly.

6        How old are you, Mr. Stenson?

7   A.   I'm 66 years old.

8   Q.   All right.  And during your lifetime, have you lived

9   overseas?

10  A.   Yes, I have.

11  Q.   Okay.  For approximately how long a period of time did you

12  live overseas?

13  A.   About 30 years.

14  Q.   And when did you start living overseas?

15  A.   Well, I started from 1988 to 1989, and then I came back to

16  America for one year, and then I left in 1990 and only came

17  back for summer vacations until I was arrested in 2019.

18  Q.   And in the time that you spent overseas, and I believe you

19  said it was 30 years, where -- what countries did you live in?

20  A.   Columbia, South America, for one year from '88 to '89.

21  Taiwan from 1990 to '96.  Thailand from -- from 1996 to 2019.

22  And two years there, 2012 and 2013, I flew between Thailand and

23  Equatorial Guinea for -- month by month.

24  Q.   Okay.  And what type of work were you doing during those

25  years?

1  A.   In Columbia -- Columbia, I taught first grade at a

2  international school, Colegio Albania.  And then I came back to

3  Milwaukee Public Schools and finished up here and then moved to

4  Taiwan to teach at Taipei American School from 1990 to '96.

5  And then I went to Thailand and taught at Ruamrudee

6  International School.

7  Q.   Could you spell that for the court reporter.

8  A.   R-U-A-M-R-U-D-E-E International School.

9  Q.   Okay.

10  A.   And I worked there till 2001.  And then I did volunteer

11  work at Ekburapa School, E-K-B-U-R-A-P-A, until 2006.

12  Q.   Okay.  And what grades were you teaching?

13  A.   I taught -- I taught -- in Taiwan, I taught second grade

14  for six years.  In Thailand, I taught second and third grade

15  ESL for the first year and the remaining four years I taught

16  science and --

17  Q.   Was there a time in the 2000s when you left teaching?

18  A.   Yes.  In -- essentially I left full-time teaching in 2001.

19  Q.   What did you do then?

20  A.   I was a consultant for Harcourt Brace Publishing Company.

21  Q.   All right.  And how long did you do that?

22  A.   It was until about 2004.

23  Q.   Did you leave the educational field at any time in the

24  2000s?

25  A.   I'm -- I've always from that time on, I was in -- a

1  consultant in -- I was a consultant until when I was working in

2  -- for Harcourt Brace.  And I did teach 2012 and 2013 adult --

3  adult science to prepare Africans to work in offshore oil

4  platforms.  And I left it in 2012.

5  Q.  Did you go into another line of work right around the 2002

6  time frame?

7  A.  Yes.  I bought a condo because I -- I started studying

8  Ph.D. and philosophy and religious studies, and I wanted to

9  live near the university, so I bought a small condo in 2002.

10  Q.  And did that lead to anything else in terms of a career

11  path?

12  A.  I -- I enjoyed the ownership of the condo and I thought

13  that I could make money from that, and I bought a condo in

14  downtown Bangkok in 2004.  And it was immediately rented, so

15  then I started using my savings and buying more condos.

16  Q.  How many units, condo units, did you own at the time you

17  were indicted in this case?

18  A.  Actually there were 34 in my name, but some investors were

19  partial owners of other -- of some of them.

20  Q.  Now, you were arrested when on this case?

21  A.  On July 12th, 2019.

22  Q.  And you mentioned the number of condo units you owned.  Did

23  you have -- were those all overseas?

24  A.  They were all in the City of Bangkok.

25  Q.  And you were arrested where?

1   A.   In West Allis.

2   Q.   Did you have anyone back in Thailand to manage your

3   properties?

4   A.   I had a informal personal assistant.  I was -- because of

5   my age, I was trying to wean myself of managing the day to day

6   small things with the 34 units.

7   Q.   Did that cause you any anxiety, having all these properties

8   you said in the City of Bangkok, but here you are over in West

9   Allis?

10  A.   Of course it did.

11  Q.   Okay.  And when you were arrested, you said July 12th,

12  2019, how much time did you spend in custody before you were

13  eventually released?

14  A.   I was arrested on a Friday afternoon and kept in custody

15  for about 66 hours in a small room with nothing, no glasses, no

16  toothpaste, nothing, in West Allis Police Department.

17  Q.   And then you were transferred?

18  A.   Then on Monday before noon I was transferred here.

19  Q.   And how much time in all did you spend in custody after you

20  were first arrested in West Allis?

21  A.   Um, until what point?

22  Q.   You were released on April 15, 2020?

23  A.   About nine months.

24  Q.   Okay.  Did you have any issues with anxiety prior to the

25  time you first went into custody on this case?

1    A.   No.  And I did not need mental health care before that

2    either.

3    Q.   Okay.  What about during the time, you said approximately

4    nine months, at the Waukesha County Jail?

5    A.   Yes.

6    Q.   Okay.  And can you describe that for the Court.

7    A.   It was hellish.  I was bullied, and I'm -- I was 63 at the

8    time.  I had no experience ever in that type of institution.

9    It was so bad and -- that I kept requesting my public -- or my

10   federal defender to get me out on bail.  And his caseload

11   seemed too large, which led me to look for somebody who could

12   get me out on bail.

13   Q.   And you were eventually released on bail; is that correct?

14   A.   Yes, but -- yes, I was.

15   Q.   And what date was that, if you know?

16   A.   That was April 15th, 2020.

17   Q.   April 15, 2020?

18   A.   Yes.

19   Q.   Okay.  And where were you living after you were released?

20   A.   At my older sister's house in Madison, Wisconsin.

21   Q.   Were there any other people living in the house at the

22   time?

23   A.   Yes.  My -- my sister, her elderly husband, and my son was

24   there initially.  And when my mother came in in July, from July

25   19th to 31st for home hospice care, she died in the house while

1    I was there.  And -- oh, the son of my sister was there, too,
2    my nephew.
3    Q.   Okay.  How would you describe the home atmosphere when you
4    were living out in Madison?
5    A.   Hostile.  Toxic.  I did not know of my nephew's mental
6    illness.  He tormented me, wanted me out of the house from the
7    day I got in there.
8    Q.   Now, you indicated that you wanted to hire new counsel; is
9    that correct?
10   A.   At what point?
11   Q.   During the time you lived in Madison you hired new counsel;
12   right?
13   A.   No.  He was hired before that and got me out on bail.
14   Q.   Okay.  But you were living in Madison, your counsel was
15   located here in Milwaukee?
16   A.   Exactly.  Yes.
17   Q.   Did the distance between Madison and Milwaukee lead to any
18   issues as far as your understanding of this case?
19   A.   Yes.  I didn't feel that there was good communication
20   between myself and my attorneys.
21   Q.   Mr. Stenson, you indicated earlier about your work in
22   education.  Do you have any training in the law?
23   A.   None.
24   Q.   Did you have any understanding of the legal system in the
25   US at the time that you were indicted?

1  A.  No, very little.  I -- nothing.

2  Q.  In fact, were you even able to -- not that this is a good

3  source, necessarily, but even learn about the US legal system

4  from TV or news or anything like that when you were living over

5  in Thailand?

6  A.  No, not even -- not even as a child.  But when I was

7  staying in Madison, my sister's elderly husband liked to watch

8  Perry Mason every day.

9  Q.  Right.  Now I'd like to talk to you a little bit about

10  during the time you were living in Madison at your sister's

11  house.  How would you describe your anxiety in that time?

12  A.  It was quite high.  But fortunately, I requested from my

13  probation officer to get mental health care.  And I had

14  somebody to talk to every other week and -- and to try to

15  control it.  But it was very high because my sister was not

16  what I thought she was.  I hadn't seen her that much for --

17  over the decades.  And she -- she was hostile, along with her

18  son.

19  Q.  Okay.  Did you start taking any medication in that time?

20  A.  I was taking medication since even before then.  So I

21  continued to take medication.

22  Q.  And what medication were you taking?

23  A.  Well, I took a lot of -- I mean, I took a lot of

24  supplements, but the medication that I would take would be

25  every week I would take a clonazepam to get good sleep about

1    once a week, or otherwise I used to only take benzodiazepine or

2    benzos on airplane flights because of anxiety.

3    Q.  Okay.  So for sleeping you would take clonazipine; correct?

4    A.  Clonazepam, yeah.

5    Q.  Did that help?

6    A.  It totally relaxed me and knocked me out and let me have

7    delicious sleep.  That's why I was -- I didn't want to get

8    hooked.  I took it once a week.

9    Q.  Now, at some point you signed a plea agreement in this

10   case; is that correct?

11   A.  That's right.

12           MR. PLANTINGA:  Judge, I'd ask to take judicial

13   notice.  It's Document 68 in the record, and it appears that it

14   was signed on April 23rd, 2021.

15           THE COURT:  Without objection.

16           MR. PLANTINGA:  Okay.

17   BY MR. PLANTINGA:

18   Q.  So April 23, 2021, you signed the plea agreement.  Did you

19   appear in court concerning a change of plea in or around that

20   time?

21   A.  The day -- the day, April 23rd, yeah.  Yes.

22   Q.  Okay.  So the same day that you signed the plea agreement,

23   you appeared in court; correct?

24   A.  Yes.

25   Q.  Had you taken any medication on the morning that you

1   appeared in court?

2   A.  Yes, I did.

3   Q.  And what did you take?

4   A.  Clonazepam.

5   Q.  How -- how did that affect you?

6   A.  It made me appear calm when inside I was very -- what

7   should I say -- anxious and scared and confused.

8   Q.  Do you feel that your mental state after you had taken that

9   medication had an affect on your understanding of the court

10  proceedings that day?

11  A.  I believe it certainly did, yes.

12  Q.  And what -- what effect would that have, do you believe?

13  A.  It made me even more compliant than I have been my entire

14  life.  I mean, I'm -- it made me -- it made me sign something

15  that I definitely did not mean to sign.

16  Q.  Did it -- you said you appeared in court on that same day,

17  April 23, 2021.

18  A.  Yes.

19  Q.  Did it also have any effect on you during that court

20  appearance?

21  A.  During the court appearance, of course it was keeping me

22  calm because I was totally befuddled and facing the worst

23  dilemma of my life.

24  Q.  Okay.  Is -- do you believe that your plea was knowing and

25  voluntary?

1    A.  No, I don't.

2    Q.  And it's your desire to withdraw your plea and proceed to

3    trial; is that correct?

4    A.  Yes, it is.  More than anything I want to go to trial and

5    be given my constitutional right to a trial.

6            MR. PLANTINGA:  Okay.  That's all I have for this

7    witness.  Thank you, Judge.

8            MR. CLAYMAN:  Thank you, your Honor.

9                       CROSS-EXAMINATION

10                      BY MR. CLAYMAN:

11   Q.  Good morning, Mr. Stenson.  You were asked about the change

12   of plea hearing just now.  Do you recall that?

13   A.  Yes, on April 23rd.

14   Q.  Right.  And you recall that the Court asked you questions

15   at that hearing; correct?

16   A.  Yes.

17   Q.  And you said you understood those questions; correct?

18   A.  Yes, I did.

19   Q.  And you told the Court that you would answer the Court's

20   questions truthfully; correct?

21   A.  Yes.

22   Q.  You actually said that you understood you could be

23   prosecuted for providing false statements if you didn't answer

24   the Court's questions truthfully at that hearing; right?

25   A.  Yes.

1        MR. PLANTINGA:  Could I ask counsel to use the

2   microphone.  I'm having a little trouble hearing.  Thanks.

3   BY MR. CLAYMAN:

4   Q.  And at the plea hearing, you told the Court that you were

5   pleading guilty because that was the most sensible option for

6   you; correct?

7   A.  I don't remember saying it was the most sensible option.

8   Q.  Do you remember telling the Court that you had an

9   opportunity to talk about the plea with your lawyers?

10  A.  I didn't want to talk to my lawyers anymore at that point.

11  I was frightened of my lawyers.  I did -- I wanted to relieve

12  my lawyer of the duty at that point.  I didn't -- I was afraid

13  of if I refused to sign it that that lawyer would not put his

14  heart into defending me on a trial.  And that's also why I was

15  confused.

16  Q.  Mr. Stenson, you told the Court that you had an opportunity

17  and enough time to talk about the plea agreement with your

18  counsel at the plea hearing; correct?

19  A.  I did, but...

20  Q.  You also told the Court that you were very satisfied with

21  the representation your counsel provided; is that correct?

22  A.  Yes, but I was terrified at the time.

23  Q.  You didn't tell the Court you were terrified, did you?

24  A.  Right.  I didn't want to upset things.  I didn't understand

25  the --

1  Q.   Right.  You said you were very --

2  A.   -- I --

3  Q.   -- satisfied with counsel; is that correct, Mr. Stenson?

4  A.   I said it, but I -- I obviously apologize to the Court and

5  to the judge for -- for giving mis -- what -- it wasn't

6  misinformation, it was just confused information, because I had

7  no other alternative because I didn't want to make a -- a

8  ruckus in here.  I didn't want to lose the judge's respect.  I

9  felt like I was going with the flow, but I did not believe it

10  sincerely.

11  Q.   You told the Court that you reviewed the indictment; is

12  that correct, Mr. Stenson?

13  A.   The indictment?

14  Q.   The indictment.  You told the Court that you had reviewed

15  that document with your counsel; correct?

16  A.   I don't remember anything about the indictment.

17  Q.   The charging document in this case, Mr. Stenson.  You told

18  the Court you understood the charges against you; correct?

19  A.   I was -- I was saying yes to everything at that time

20  because I was frightened and confused.

21  Q.   So did you tell the Court that you had reviewed the

22  indictment, Mr. Stenson?

23  A.   I don't remember.

24  Q.   Did you tell the Court that you understood the charges

25  against you?

1    A.   I said yes to everything that day.

2    Q.   Mr. Stenson, did you tell the Court that you understood the

3    charges against you at the plea hearing?

4    A.   Yes, sir.

5    Q.   And you told the Court you'd reviewed the plea agreement;

6    correct?

7    A.   Yeah.

8    Q.   You told the Court that you understood the rights you were

9    giving up by pleading guilty; correct?

10   A.   I may have told him that.  That's -- I said yes to

11   everything, without even hearing.

12   Q.   You didn't mention that you were -- you had taken

13   clonazepam that morning, correct, at the plea hearing?

14   A.   No, that was not mentioned.

15   Q.   Did you take any medication prior to today's hearing, Mr.

16   Stenson?

17   A.   No, because I'm in custody.

18   Q.   You also told the Court that the statement of facts that

19   were submitted with your plea agreement, that you had reviewed

20   those; correct?

21   A.   Statement of facts?

22   Q.   The description of your offense conduct?

23   A.   Oh.  Yes, and I completely disagreed with it.

24   Q.   You told the Court that those statement of facts -- that

25   that was substantially correct, isn't that right?

1  A.  Did I?

2  Q.  I'm asking you, Mr. Stenson.  Did you tell the Court at the

3  change of plea hearing that the facts that were submitted with

4  your plea agreement were correct?

5  A.  Yes, I did.

6  Q.  You actually told the probation officer that you regretted

7  your conduct in this case; is that correct?

8  A.  I didn't tell him anything of the sort.  I -- no.

9  Q.  You've never told the probation office that you regretted

10  your conduct in this case, Mr. Stenson?

11  A.  The only conduct I regret is signing the plea agreement

12  because I was cowed and confused and afraid to fire my attorney

13  on that very day.

14  Q.  At the plea hearing, Mr. Stenson, you told the Court that

15  no one had promised you anything other than what was laid out

16  in the plea agreement in order for you to plead guilty; is that

17  correct?

18  A.  I said yes to that.

19  Q.  And you told the Court you were pleading guilty

20  voluntarily; correct?

21  A.  Yes, I said that.  I believe I said that.  But it wasn't

22  voluntary.

23  Q.  And you told the Court that you were pleading guilty

24  because you were, in fact, guilty of the conduct described in

25  the statement of facts in the plea agreement; correct?

1    A.   Yes, but I said yes to everything that day.

2              MR. CLAYMAN:  One moment, your Honor.

3              THE COURT:  I'm sorry?

4              MR. CLAYMAN:  If I could have one moment, your Honor.

5              THE COURT:  Yeah, yeah.

6              (Government attorneys confer off the record.)

7              MR. CLAYMAN:  Nothing further from the Government,

8    your Honor.

9              MR. PLANTINGA:  Nothing more for the defense.  Thanks.

10             THE COURT:  All right.  Thank you.  You're -- you can

11   step down, Mr. Stenson.

12             (Witness excused.)

13             THE COURT:  So if anybody wants to make any statement

14   or argument now, I'll hear it; or if anybody wants to submit

15   anything, I'll do it that way, too, whatever counsel's pleasure

16   is.

17             MR. PLANTINGA:  Judge, from the defense perspective, I

18   think everything that we would have to say is either in the

19   written materials already filed with the Court or in today's

20   testimony, so I'm not looking to be heard further.

21             THE COURT:  Okay.  Government?

22             MR. CLAYMAN:  Just briefly, your Honor, I would -- I

23   would just point the Court to the transcript of the plea

24   hearing where the defendant, Mr. Stenson, readily admitted to

25   his voluntariness of pleading guilty.  He acknowledged the

1    statement of facts were correct.  He told the Court

2    unambiguously that he was pleased with his counsel and had no

3    issues understanding the charges against him or anything in the

4    plea agreement.  I think in a scenario like this where the

5    transcript of the plea hearing is unambiguous and it clearly

6    contradicts all of the after-the-fact assertions the defendant

7    is making that the Court should defer to those statements that

8    the defendant made under oath at the plea hearing.  And we

9    would ask that the Court deny the motion.

10         THE COURT:  Okay.  I think probably the most sensible

11    thing to do would be for me to have a written decision.  And

12    I'll do that shortly.  Okay.  Thank you.

13         MR. PLANTINGA:  All right.  Thank you.

14         MR. CLAYMAN:  Thank you, your Honor.

15         MS. PAULSON:  Thank you, your Honor.

16         (At 9:55 a.m. the hearing ended.)

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3                    I, JENNIFER L. STAKE, RDR, CRR, an Official

4     Court Reporter for the United States District Court for the

5     Eastern District of Wisconsin, do hereby certify that the

6     foregoing is a true and correct transcript of all the

7     proceedings had and testimony taken in the above-entitled

8     matter as the same are contained in my original machine

9     shorthand notes on the said trial or proceeding.

10

11

12    Dated this 15th day of November, 2022.

13    Milwaukee, Wisconsin.

14

15

16                    Jennifer L. Stake, RDR, CRR
                 United States Official Court Reporter
17               517 East Wisconsin Avenue, Room 324
                        Milwaukee, WI   53202
18

19                    Jennifer_Stake@wied.uscourts.gov

20

21

22    ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
      Official Court Reporter, RDR, CRR
23    _____

24

25